WISE, Presiding Judge.
 

 The appellant, Rodney Labrone Smith, pled guilty to unlawful possession of a controlled substance, a violation of § 13A-12 — 212(a)(1), Ala.Code 1975, and unlawful possession of drug paraphernalia, a violation of § 13A-12-260, Ala.Code 1975. The trial court sentenced him to serve a term of one year and a day in prison on the unlawful possession of a controlled substance conviction, but suspended the sentence and ordered him to serve two years on supervised probation. It also ordered him to pay a $25 fine on the unlawful possession of drug paraphernalia conviction. Finally, the trial court imposed a $1,000 Demand Reduction Assessment Act fine on the unlawful possession of a controlled substance conviction.
 
 See
 
 § 13A-12-281, Ala.Code 1975. Smith did not file any post-judgment motions. This appeal followed.
 

 Officer Michael Danley of the Huntsville Police Department testified that, a little after 9:00 p.m. on October 23, 2006, he was driving down Calvary Street; that the department had a lot of drug problems on that street, and the department performed “drug details” on that street; that the area was dark; that he saw Smith walking in the middle of the street; that he stopped Smith to see what was going on at that time; and that he talked to people on that street all of the time because of the problems in that area. He also testified that he got out of his vehicle, approached Smith, and patted him down for officer safety; that he probably asked Smith his name; that, normally, he would ask a subject’s name and pat him down at the same time; that he checks people as soon as he gets out of his vehicle and approaches them to make sure they do not have a weapon; that he felt something in Smith’s pocket; that he asked Smith about what was in his pocket; that Smith said he had a crack pipe in his pocket; that he removed the crack pipe from Smith’s pocket; that he arrested Smith for unlawful possession of drug paraphernalia; and that he transported Smith to the metro jail. Dan-ley further testified that, before they entered the booking area, he asked Smith if he had drugs or anything else on him; that Smith told him he had a small crack rock in his left pants pocket; and that he removed the crack rock from Smith’s pocket.
 

 Smith argues that the trial court erroneously denied his motion to suppress the evidence Danley seized from his pockets. Specifically, he contends that Danley did not have reasonable suspicion to stop him and conduct a patdown search.
 
 [1]
 
 We addressed a similar situation in
 
 W.D.H. v. State,
 
 16 So.3d 121, 123-28 (Ala.Crim.App.2008), as follows:
 

 “The evidence adduced at the suppression hearing tended to show the following. Detective W.B. Hamil of the Montgomery Police Department narcot
 
 *914
 
 ics bureau testified that the police had been receiving complaints of a person shooting and selling drugs in a certain block in Tulane Court. He said that the complaints ‘just accumulated to this day,’ when police decided they ‘needfed] to go down there and basically find out what’s going on and basically walk through the area.’ (R. 8.) Det. Hamil acknowledged that he did not have a description of any possible suspects.
 

 “Det. Hamil said the ‘whole bureau’ went to Tulane Court, arriving about 1:30 p.m. on a Saturday. When they arrived in the area, Det. Hamil said, he approached W.D.H. and two other people who, he said, were sitting down. Det. Hamil said when the three saw the police, they got up and started to walk away, but stopped when asked. Other people who were gathered in the area ran. W.D.H. testified that he was already standing up when police arrived in the area and that he did not attempt to leave.
 

 “Det. Hamil said W.D.H. and the other two looked nervous and startled. Det. Hamil said that he did not know specifically what kind of criminal activity may have been taking place, but that ‘something wasn’t right.’ (R. 13.) He also said that when he approached W.D.H. and the other two males, he did not see any weapons and no one gave any indication that weapons were present. (R. 10.)
 

 “Det. Hamil stopped W.D.H. because he looked nervous and he had begun walking away. After stopping W.D.H., Hamil said, he conducted a pat-down search for weapons for his own safety. During the pat-down search, Det. Hamil said he felt a soft bulge in W.D.H.’s pocket. W.D.H. told Det. Hamil, ‘That ain’t nothing but just a little weed.’ (R. 17.) Det. Hamil removed the packet, which was marijuana. W.D.H. acknowledged that when Det. Hamil patted him down, he admitted to having marijuana in his pocket.
 

 “W.D.H. was arrested for possession of marijuana.
 

 “ ‘ “The trial court held the suppression hearing outside the hearing of the jury; therefore, we review the eviden-tiary findings of the trial court at that hearing under the
 
 ore tenus
 
 standard.”
 
 Ex parte Jackson,
 
 886 So.2d 155, 159 (Ala.2004). “When evidence is presented
 
 ore tenus
 
 to the trial court, the court’s findings of fact based on that evidence are presumed to be correct,”
 
 Ex parte Perkins,
 
 646 So.2d 46, 47 (Ala.1994); “[w]e indulge a presumption that the trial court properly ruled on the weight and probative force of the evidence,”
 
 Bradley v. State,
 
 494 So.2d 750, 761 (Ala.Crim.App.1985), aff'd, 494 So.2d 772 (Ala.1986); and we make “ ‘all the reasonable inferences and credibility choices supportive of the decision of the trial court.’ ”
 
 Kennedy v. State,
 
 640 So.2d 22, 26 (Ala.Crim.App.1993), quoting
 
 Bradley,
 
 494 So.2d at 761. “ ‘ “Where evidence is presented to the trial court
 
 ore tenus
 
 in a nonjury case, a presumption of correctness exists as to the court’s conclusions on issues of fact; its determination will not be disturbed unless clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence.” ’ ”
 
 Ex parte Jackson,
 
 886 So.2d at 159, quoting
 
 State v. Hill,
 
 690 So.2d 1201, 1203 (Ala.1996), quoting in turn
 
 Ex parte Agee,
 
 669 So.2d 102, 104 (Ala.1995).
 

 “ ‘However, “[t]he
 
 ore tenus
 
 presumption of correctness applies to findings of fact, not to conclusions of law.”
 
 City of Russellville Zoning Bd. of Adjustment v. Vernon,
 
 842 So.2d
 
 *915
 
 627, 629 (Ala.2002). “[T]he ore tenus rule does not extend to cloak a trial judge’s conclusions of law, or incorrect application of law to the facts, with a presumption of correctness.”
 
 Eubanks v. Hale,
 
 752 So.2d 1113, 1144-45 (Ala.1999). ‘““[Wjhen the trial court improperly applies the law to the facts, no presumption of correctness exists as to the court’s judgment.” ’ ”
 
 Ex parte Jackson,
 
 886 So.2d at 159, quoting
 
 Hill,
 
 690 So.2d at 1203, quoting in turn,
 
 Ex parte Agee,
 
 669 So.2d at 104. Thus, we review the trial court’s conclusions of law and its application of law to the facts under the de novo standard of review.’
 

 “Washington v. State,
 
 922 So.2d 145, 157-58 (Ala.Crim.App.2005).
 

 “In
 
 B.J.C. v. State,
 
 992 So.2d 90 (Ala.Crim.App.2008), this court cited
 
 Florida v. J.L.,
 
 529 U.S. 266 (2000), in which the United States Supreme Court reiterated the standard to be applied in a ‘stop and frisk’ situation.
 

 “ ‘ “Our ‘stop and frisk’ decisions begin with
 
 Terry v. Ohio,
 
 392 U.S. 1 (1968). This Court held in
 
 Terry:
 

 “ ‘ “ ‘[Wjhere a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.’
 
 Id.,
 
 at 30’ ”.
 

 “B.J.C.,
 
 992 So.2d at 91.
 

 “The circumstances in this case are analogous to those in
 
 Ex parte James,
 
 797 So.2d 413 (Ala.2000), in which the Alabama Supreme Court determined that the stop and search of the defendant were unconstitutional. In
 
 James,
 
 a police officer was patrolling an area known as a high drug-crime area when he noticed a van pulled over on the side of the road. Two or three people outside the van were talking into the van’s window, but the officer could not see what, if anything, James, who was driving the van, and the others were doing.
 
 Id.
 
 at 414.
 

 “When the officer approached the van, the people outside the van ran, and James pulled onto the road and drove away. The officer followed the van and pulled it over at a service station. James got out of the van and approached the officer, who asked whether the driver had any weapons. James said that he did not, and the officer replied that he had to conduct a pat-down search anyway for safety reasons. At that time, James reached toward his pocket. The officer tapped James’s hand out of the way and reached into the pocket for which James had been reaching. The officer found marijuana cigarettes in the pocket.
 
 Id.
 

 “In finding that the trial court improperly denied James’s motion to suppress because the stop was unconstitutional, the Alabama Supreme Court noted that
 
 Terry
 
 provides:
 

 “‘[A] police officer may conduct a brief investigatory stop of a person
 
 if the officer has a reasonable suspicion supported by “specific and
 
 
 *916
 

 articuable [sic] facts” that the individual is, or is about to be, involved in criminal activity.
 
 The officer may also conduct a patdown search of the outer clothing of the person if the officer is “justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others.” ’
 

 “James,
 
 797 So.2d at 414-15 (emphasis in
 
 James),
 
 quoting
 
 Terry,
 
 392 U.S. at 24.
 

 “The
 
 James
 
 Court noted that
 

 “‘“[a]n individual’s presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.
 
 Brown v. Texas,
 
 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a ‘high crime area’ among the relevant contextual considerations in a
 
 Terry
 
 analysis.
 
 Adams v. Williams,
 
 407 U.S. 143, 144 and 147-48, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
 

 “ ‘ “In this case, moreover, it was not merely respondent’s presence in an area of heavy narcotics trafficking that aroused the officers’ suspicion but his
 
 unprovoked flight
 
 upon noticing the police. Our cases have also recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.
 
 United States v. Brignoni-Ponce,
 
 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975);
 
 Florida v. Rodriguez,
 
 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984)
 
 (per
 
 curiam);
 
 United States v. Sokolow,
 
 [490 U.S. 1], at 8-9 [109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)].
 
 Headlong flight
 
 — wherever it occurs — is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.... We conclude Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further.
 

 “ ‘ “Such a holding is entirely consistent with our decision in
 
 Florida v. Royer,
 
 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where we held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.
 
 Id.,
 
 at 498, 103 S.Ct. 1319. And any ‘refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.’
 
 Florida v. Bostick,
 
 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not ‘going about one’s business’; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual’s right to go about his business or to stay put and remain silent in the face of police questioning.”
 

 “
 
 ‘[Illinois
 
 v.]
 
 Wardlow,
 
 528 U.S. [119] at 124, 120 S.Ct. [673] at 676 [ (2000) ] (emphasis added).’
 

 “James,
 
 797 So.2d at 416-417.
 

 
 *917
 
 “In determining that the stop of James was unconstitutional and that the motion to suppress should have been granted, the Alabama Supreme Court found that, in leaving the site where he had been talking to others, James ‘did not go on “headlong flight” ’ and that driving away could not be deemed unprovoked or unusual.
 
 Id.
 
 at 417. The court found that had the officer chosen to pursue the other people who ran from the van, the
 
 Wardlow
 
 rule, cited above, might be applicable, but it was not in James’s case. The court also found that, because the officer testified that he did not know what James and the others were doing at the van, and that he did not see the parties exchange anything, he had not legally justifiable reason for stopping James.
 

 “Here, Det. Hamil acknowledged that he did not have a description of any possible suspects who may have been involved in the drug activity or shooting reported in Tulane Court. When he arrived at the location, which was on a Saturday afternoon, W.D.H. was one of several people outside. Det. Hamil said that when he saw the police, W.D.H. and others walked off, but W.D.H. stopped when he was asked to by Det. Hamil. Other people ran from the scene, but Hamil did not go after them.
 

 “Hamil testified that he thought criminal activity was afoot, but he explicitly said he did not know what kind of activity was wrongful. He based his stop of W.D.H. on the facts that W.D.H. looked nervous and Det. Hamil thought that ‘something wasn’t right,’ which is clearly not an articuable reason for believing criminal activity is afoot. In addition, Det. Hamil said that when he approached W.D.H. and did the pat-down search, he had no indication that anyone had a weapon.
 

 “We find that Det. Hamil had no specific, articuable reason for stopping W.D.H. to conduct a pat-down search pursuant to
 
 Terry.
 
 W.D.H. was within his rights to walk away when he saw the police on the street, and he stopped when Hamil asked him to. Like James, W.D.H. did not go on a headlong flight. Because there had been reports of shooting in the area over a period of time, an argument could be made that the police acted properly pursuant to a
 
 Terry
 
 ‘stop and frisk’ when W.D.H. was patted down for a weapon. The United States Supreme Court rejected such an argument in
 
 J.L.,
 
 explaining:
 

 “ ‘ “A second major argument advanced by Florida and the United States as amicus is, in essence, that the standard
 
 Terry
 
 analysis should be modified to license a ‘firearm exception.’ Under such an exception, a tip alleging an illegal gun would justify a stop and frisk even if the accusation would fail standard pre-search reliability testing. We decline to adopt this position.
 

 “ ‘ “Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions. Our decisions recognize the serious threat that armed criminals pose to public safety; Terry’s rule, which permits protective police searches on the basis of reasonable suspicion rather than demanding that officers meet the higher standard of probable cause, responds to this very concern. See 392 U.S., at 30. But an automatic firearm exception to our established reliability analysis would rove too far. Such an exception would enable any person seeking to harass another to set in motion an intrusive, embarrassing police search of the targeted person simply by placing an anony
 
 *918
 
 mous call falsely reporting the target’s unlawful carriage of a gun. Nor could one securely confine such an exception to allegations involving firearms. Several Courts of Appeals have held it per se foreseeable for people carrying significant amounts of illegal drugs to be carrying guns as well. See, e.g.,
 
 United States v. Sakyi,
 
 160 F.3d 164, 169 (C.A.4 1998);
 
 United States v. Bean,
 
 59 F.3d 1479, 1490, n. 20 (C.A.5 1995);
 
 United States v. Odom,
 
 13 F.3d 949, 959 (C.A.6 1994);
 
 United States v. Martinez,
 
 958 F.2d 217, 219 (C.A.8 1992). If police officers may properly conduct
 
 Terry
 
 frisks on the basis of bare-boned tips about guns, it would be reasonable to maintain under the above-cited decisions that the police should similarly have discretion to frisk based on bare-boned tips about narcotics. As we clarified when we made indi-cia of reliability critical in
 
 Adams [v. Williams,
 
 407 U.S. 143 (1972),] and
 
 [Alabama v.] White
 
 [, 496 U.S. 325 (1990),] the Fourth Amendment is not so easily satisfied. Cf.
 
 Richards v. Wisconsin,
 
 520 U.S. 385, 393-394, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) (rejecting a
 
 per se
 
 exception to the ‘knock and announce’ rule for narcotics cases partly because ‘the reasons for creating an exception in one category [of Fourth Amendment cases] can, relatively easily, be applied to others,’ thus allowing the exception to swallow the rule).
 

 “ ‘ “The facts of this case do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, that a report of a person carrying a bomb need bear the indi-cia of reliability we demand for a report of a person carrying a firearm before the police can constitutionally conduct a frisk. Nor do we hold that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports, see
 
 Florida v. Rodriguez,
 
 469 U.S. 1 (1984) (per curiam), and schools, see
 
 New Jersey v. T.L.O.,
 
 469 U.S. 325 (1985), cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.
 

 “ ‘ “Finally, the requirement that an anonymous tip bear standard in-dicia of reliability in order to justify a stop in no way diminishes a police officer’s prerogative, in accord with
 
 Terry,
 
 to conduct a protective search of a person who has already been legitimately stopped. We speak in today’s decision only of cases in which the officer’s authority to make the initial stop is at issue. In that context, we hold that an anonymous tip lacking indicia of reliability of the kind contemplated in
 
 Adams
 
 and
 
 White
 
 does not justify a stop and frisk whenever and however it alleges the illegal possession of a firearm.”
 

 “
 
 ‘Florida v. J.L.,
 
 529 U.S. at 269-74 (footnote omitted).’
 

 "B.J.C., 992 So.2d at 93-94.
 

 “Here, the police had received complaints about drug activity and shooting in a certain neighborhood, but Det. Hamil said he did not have a suspect or a description of a suspect who might have been responsible. Again, there is simply no evidence in the record to support a finding that Det. Hamil had a reasonable suspicion to stop and search W.D.H. Therefore, we hold that the stop and search of W.D.H. were unconstitutional.”
 

 
 *919
 
 In this case, Danley testified that he stopped Smith because he was walking in the middle of the street; that the area was dark; and that there was a lot of drug activity in that area. With regard to the patdown, Danley asserted that he patted Smith down for officer safety and that he usually checks subjects for weapons when he gets out of the vehicle and approaches them. However, Danley did not testify that he believed Smith was armed. Further, he did not testify as to any specific facts that would support a finding that he was justified in believing that Smith was armed and presently dangerous. Therefore, Danley was not justified in stopping Smith and performing a patdown search, and the trial court erred when it denied Smith’s motion to suppress the evidence Danley seized from his person.
 
 See W.D.H.,
 
 supra. Accordingly, we reverse the trial court’s judgment and remand this case for proceedings that are consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 WELCH and WINDOM, JJ„ concur.
 

 KELLUM, J., concurs in the result.
 

 [1]
 

 . When he entered his guilty plea, Smith reserved the right to appeal the denial of his motion to suppress.